This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-39163

**STATE OF NEW MEXICO ex rel. CHILDREN, YOUTH & FAMILIES DEPARTMENT,**

 Petitioner-Appellee,

v.

**PAUL G.,**

 Respondent-Appellant,

and

**SABRINA G.,**

 Respondent,

**IN THE MATTER OF JYSELLE G., RICHARD G., and JAYLA R.,**

 Children.

**APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY**
**Allen Smith, District Judge**

Children, Youth & Families Department
Mary McQueeney, Acting Chief Children's Court Attorney
Santa Fe, NM
Kelly P. O'Neill, Children's Court Attorney
Albuquerque, NM

for Appellee

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant

Law Office of Shasta N. Inman, LLC
Shasta N. Inman
Albuquerque, NM

Guardian Ad Litem

## DECISION

**YOHALEM, Judge.**

**{1}**    Father appeals a district court order terminating his parental rights. Finding no error, we affirm. Because the parties are familiar with the record, and because this is an expedited bench decision, we discuss the facts and proceedings as necessary in connection with our discussion of the issues.

## DISCUSSION

**{2}**    Father challenges the termination of his parental rights to his three children (Children), claiming that the Children, Youth and Families Department (the Department) failed to make the reasonable efforts required by NMSA 1978, Section 32A-4-28(B)(2) (2005) to assist him in remedying the conditions and causes of neglect and abuse that rendered him unable to properly care for Children. Father does not challenge the district court's finding that further efforts by the Department would be futile. Father instead contends that the Department failed to make reasonable efforts prior to the futility finding and claims, as well, that the district court's finding of fact—that the Department made reasonable efforts overall, including during the period after the futility finding— was not supported by substantial evidence in the record. We conclude that the district court's finding that the Department made reasonable efforts despite the futility finding is supported by substantial clear and convincing evidence in the record. The district court properly considered the totality of the circumstances throughout the time from the filing of the petition to the termination of Father's parental rights in evaluating the efforts made by the Department.

**{3}**    On review, this Court will affirm a district court's finding that the Department made reasonable efforts to assist a parent if that finding is supported by substantial evidence in the record. *State ex rel. Child., Youth & Fams. Dep't v. Keon H.*, 2018-NMSC-033, ¶ 36, 421 P.3d 814. "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted). Due process requires that findings necessary to terminate parental rights be supported by clear and convincing evidence. *State ex rel. Child., Youth & Fams. Dep't v. Nathan H.*, 2016-NMCA-043, ¶ 31, 370 P.3d 782. "Clear and convincing evidence means evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *Id.* (internal quotation marks and citation omitted). When reviewing a termination of parental rights decision, we are not permitted

to either reweigh the evidence or assess the credibility of the witnesses; we must defer to the conclusions of the trier of fact and view the evidence in a light most favorable to affirmance. *State ex rel. Child., Youth & Fams. Dep't v. Vanessa C.*, 2000-NMCA-025, ¶¶ 24, 28, 128 N.M. 701, 997 P.2d 833. "Our standard of review is therefore whether, viewing the evidence in the light most favorable to the [Department], the fact finder could properly determine that the clear and convincing evidence standard was met." *In re Termination of Parental Rights of Eventyr J.*, 1995-NMCA-087, ¶ 3, 120 N.M. 463, 902 P.2d 1066.

{4}     In considering whether the Department made reasonable efforts, "our job is not to determine whether [the Department] did everything possible; our task is limited by our statutory scope of review to whether [the Department] complied with the minimum required under law." *State ex rel. Child., Youth & Fams. Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 28, 132 N.M. 299, 47 P.3d 859. Section 32A-4-28(B)(2) of the Abuse and Neglect Act does not list specific methods of assistance that are sufficient to constitute reasonable efforts. Instead, what efforts are reasonable varies depending on "a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting." *Patricia H.*, 2002-NMCA-061, ¶ 23. We consider the totality of the circumstances when determining whether the efforts made by the Department were reasonable. *Keon H.*, 2018-NMSC-033, ¶ 41. In so doing, we look to the Department's "efforts as a whole" during the entire period of time the Department worked with the parent. *Id.* ¶ 46. "Both the Department and [the parent] are responsible for making efforts toward reunification of the family." *Id.* ¶ 48. The parent must cooperate with any treatment plan approved by the court, and has an obligation to maintain contact with his counsel and the Department. *Id.*; NMSA 1978, § 32A-4-22(C) (2016). Although the Department is not permitted to withdraw its efforts without the district court excusing such efforts because of a finding of futility or aggravated circumstances, *Keon H.*, 2018-NMSC-033, ¶ 40, the parent is ultimately responsible for their refusal or failure to take advantage of those efforts. *Id.* ¶ 48.

{5}     In the case of a parent who is incarcerated, as Father was when the abuse and neglect petition was filed on March 21, 2018, the Department is not relieved of its responsibility to make reasonable efforts based on the mere fact of incarceration. *See* § 32A-4-28(D) (stating that the Department may not petition to terminate parental rights based solely on a parent's incarceration). The Department must make contact with the parent and provide the assistance it can during the period of incarceration. *See, e.g.*, *State ex rel. Child. Youth & Fams. Dep't v. William M.*, 2007-NMCA-055, ¶¶ 68-71, 141 N.M. 765, 161 P.3d 262.

{6}     Keeping these principles of law in mind, we look first at the evidence concerning the Department's efforts following the filing of the abuse and neglect petition on March 21, 2018. When Children were taken into custody, Father was incarcerated in Colorado. Fransisca Griego, the Department permanency worker assigned to Father's case, testified that in April 2018, she reached Father's caseworker in the Colorado detention center where Father was held and was able to conduct a phone conversation with

Father. During that conversation, Griego discussed with Father Children's current situation and placement, Children's needs, and the concerns of the Department and Children's caregivers; and Father told Griego that he expected to be released around May 2018, less than two months later. Father appeared telephonically at a district court judicial review hearing on May 8, 2018.

{7}     Griego testified that after her initial April 2018 phone call with Father, and the May 8, 2018 hearing, she did not have any contact with Father until he contacted her in March or April 2019. Father's claim that the Department denied him reasonable efforts focuses on this period of time. Although we agree that the Department could and should have been more diligent in maintaining contact with Father and in providing the envelopes and other written materials, Father's argument that the Department should have known where he was throughout that time period is not supported by the evidence at the termination of parental rights hearing. Father remained incarcerated in Colorado facilities until July 2018, when he was released to a halfway house, where he remained for about four months. During that time, Griego testified, without disagreement by Father, that Father made no attempt to contact her. Griego testified that she was unable to locate Father despite making efforts to find him because the correctional facility in Colorado no longer listed him as in custody and did not report his current whereabouts. Griego also testified that during that time (and other times during the case where Father's whereabouts were unknown to the Department), she would regularly conduct internet searches (including searches of inmate locator databases), contact his mother and Children's foster parents, and do social media research, all to no avail. When he testified about this four-month period, Father gave no explanation for failing to contact neither Children nor the Department. Father was again incarcerated in Colorado in September or October 2018.

{8}     In February 2019, at an initial permanency hearing, the Department sought a futility finding, which the court granted based on the district court's finding at the adjudication of aggravated circumstances due to the involuntary termination of Father's parental rights to another child, and on Father's failure to stay in contact with the Department. As noted, Father has not challenged the futility finding on appeal.

{9}     A month after the futility finding was entered, in March 2019, Father was again released to a halfway house in Colorado. This time, he contacted the Department. For a three-month period, until June 2019, Griego was in regular contact with Father. During these three months, she did a psychosocial evaluation of Father, set up counseling and substance abuse groups for him, and set up individual counseling and parenting instruction at Dove Counseling. Griego arranged therapeutically supervised telephone visits between Children and Father. When Griego called Father to set up a third therapeutic telephone visit in June 2019, she got no response to her calls and texts, and eventually learned from the halfway house where Father had been staying that Father again was incarcerated. Father testified at the termination of parental rights hearing that he had violated his conditions of probation, and was returned to prison on June 6, 2019.

**{10}** When cross-examined, Griego admitted that during the times that Father was incarcerated, she did not call Father or send him letters on a monthly basis. She testified that she did send him court reports and treatment plans regarding Children, but did not send him workbooks or resources to help him work on his treatment plan while in custody, and she did not send him stamped and self-addressed envelopes to enable him to contact Children. Griego testified that the reason she was unable to maintain monthly contact with Father was that the detention centers where he was incarcerated would not allow direct contact. She testified that she did not refer Father to services because her understanding was that he would not be able to participate in any services during his incarceration. She admitted that she did not attempt to arrange for Father to appear telephonically at the Department treatment team meetings or update him about what happened in the meetings. When asked if there was a reason that she did not provide Father with any self-addressed envelopes or resources other than Children's treatment plans (such as workbooks), Griego testified that there was not.

**{11}** Griego testified that she learned in late December 2019 or early January 2020 that Father had been released from prison and had returned to New Mexico. Griego testified that she again took steps to locate Father, including unsuccessfully trying to contact him directly and through his mother. She visited his mother's home, where she (correctly) believed Father was living following his release, and knocked on the door, but no one answered.

**{12}** Father testified that he had been paroled on December 23, 2019, and that he had indeed moved back to his mother's home in Albuquerque, and was living at that home when Griego called and visited. He testified that although he was advised by his attorney to get in touch with Griego, he "never did," because he was "trying to get situated" in his new living arrangements. Father did not contact Griego until February 2020, two months after his release.

**{13}** The termination of parental rights hearing commenced on August 13, 2019, and was completed on February 17, 2020. The court delayed the continuation of the termination of parental rights hearing, at Father's request, until after his anticipated release from jail. The hearing was originally set by the district court for January 7, 2020, but was postponed by the district court when Father's attorney was unable to locate Father.

**{14}** The evidence at the termination of parental rights hearing, summarized here, is sufficient to support the district court's finding that the Department made reasonable efforts, given the totality of the circumstances. We are deeply troubled by the Department's poor efforts to communicate with Father during his periods of incarceration and the Department's failure to include him in treatment team meetings during those periods, and we would regard those efforts on their own as less than adequate. However, perfection by the Department is not required, *see Patricia H.*, 2002-NMCA-061, ¶ 28, and the appropriate focus is on the Department's efforts as a whole, from the filing of the petition, until Father's parental rights were terminated. *See Keon H.*, 2018-NMSC-033, ¶¶ 41, 46. As in *Keon H.*, the Department offered Father the

opportunity to engage in his treatment plan. Both the Department and the parent are responsible for making efforts towards reunification. *Id.* ¶ 48. Father had a chance to work with the Department had he contacted Griego upon his release to a halfway house in 2018, before the futility finding. After the futility finding, Father briefly took advantage of Department assistance when he was released a second time to a halfway house. Each time upon his return to prison, due to probation violations, Father failed to inform the Department of his whereabouts. Upon his release on parole on December 23, 2019, and return to Albuquerque, he had another opportunity to work with the Department. He once again failed to contact the Department, despite admitting at the termination of parental rights hearing that his attorney advised him to do so. At that time, the Department was actively trying to get in touch with him. As our Supreme Court found in *Keon H.*, "[t]here is no reason" why the district court could not consider the additional efforts made by the Department after the futility finding and find them reasonable. *Id.* ¶ 46. As in *Keon H.*, there was substantial evidence from which the district court could find that the Department made reasonable efforts to offer assistance to Father and that Father did not take advantage of those efforts. *See id.* ¶ 50.

**CONCLUSION**

**{15}** Concluding that substantial evidenced in the record supports the district court's finding that the Department made reasonable efforts to assist Father, we affirm the district court order terminating Father's parental rights.

**{16} IT IS SO ORDERED.**

**JANE B. YOHALEM, Judge**

**WE CONCUR:**

**JENNIFER L. ATTREP, Judge**

**ZACHARY A. IVES, Judge**